## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHEN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| Lavell Dabney, | : | Case No. 1:11CV2019 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MEMORANDUM DECISION AND ORDER** |
| Defendant. | : | |

### I. INTRODUCTION.

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), Plaintiff Lavell Dabney ("Plaintiff")

seeks judicial review of the Commissioner's ("Defendant" or "Commissioner") final

determination denying his claim for disability insurance benefits ("DIB") under Title II of the

Social Security Act (Act), 42 U.S.C. §§ 416(i) and 423 and for Supplemental Security Income

("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq* (Docket No. 1). On December 30,

2011, the parties consented to the jurisdiction of the undersigned Magistrate for all further

proceedings in this case, including trial and the entry of a final judgment (Docket No. 14).

Pending are the parties' Briefs on the merits (Docket Nos. 14 and 15). For the reasons that

follow, the Magistrate remands this case to the Commissioner for further review pursuant to the

following opinion.

1

## II. PROCEDURAL BACKGROUND

On June 5, 2009, Plaintiff filed timely applications for DIB and SSI, alleging disability beginning December 10, 2004 (Docket No. 10, pp. 184-201 of 490). Plaintiff's applications were denied initially and upon reconsideration (Docket No. 10, pp. 92-112 of 490). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Docket No. 10, pp. 132-33 of 490). This hearing took place on December 6, 2010, before ALJ Andrew M. Emerson ("ALJ Emerson") (Docket No. 10, pp. 13-29 of 490). Plaintiff, along with his representative, appeared and testified. A Vocational Expert ("VE") also appeared and testified (Docket No. 10, pp. 13-29 of 490). In a decision dated December 22, 2010, ALJ Emerson concluded Plaintiff was not entitled to either DIB or SSI (Docket No. 10, pp. 13-29 of 490). ALJ Emerson's decision became the final decision of the Commissioner when the Appeals Council denied review on July 29, 2011 (Docket No. 10, pp. 6-8 of 490).

Plaintiff filed a timely Complaint seeking judicial review of the Commissioner's decision denying benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3) in this Court (Docket No. 1).

## III. FACTUAL BACKGROUND

### A. THE ADMINISTRATIVE HEARING

An administrative hearing convened on December 6, 2010, in Cleveland, Ohio. Plaintiff and his representative appeared and Plaintiff testified. Also present and testifying was VE Robert Mosley ("Mr. Mosley") (Docket No. 1, p. 32 of 490).

### 1. PLAINTIFF'S TESTIMONY

Born on May 29, 1973, Plaintiff was thirty-seven years old as of the date of his December 22, 2010, hearing. Plaintiff is a college graduate (Docket No. 10, p. 34 of 490),

2

earning his Bachelor's Degree in Business Administration with a concentration in Marketing, with past relevant work as a salesman and sales manager (Docket No. 10, pp. 32-34 of 490). Plaintiff has a history of obesity and severe obstructive sleep apnea ("OSA") (Docket No. 10, pp. 304-05 of 490).[1] Plaintiff testified that although he has never had biological dependent children, he was involved in raising three children belonging to his ex-girlfriends (Docket No. 10, pp. 38-39 of 490). Plaintiff resides in a four floor single-family home (Docket No. 10, p. 43 of 490).

ALJ Emerson questioned Plaintiff extensively about his OSA symptoms, treatment, ability to carry on daily activities, and work history (Docket No. 10, pp. 32-63 of 490). During his testimony, Plaintiff stated he was currently under the care of multiple doctors, Dr. Raymond Salomone, M.D. ("Dr. Salomone"), his primary physician, at Marymount Hospital, Dr. Sally Ibrahim, M.D. ("Dr. Ibrahim"), of the Cleveland Clinic and her nurse practitioner Jamie Kabat ("Ms. Kabat"), and a Cleveland Clinic podiatrist (Docket No. 10, p. 44 of 490). Plaintiff reported being on Lisinopril for his high blood pressure (Docket No. 10, p. 45 of 490), Napronax for the pain in his knees and feet (Docket No. 10, p. 45 of 490), and a Continuous Positive Airway Pressure ("CPAP") machine for his OSA (Docket No. 10, pp. 35-36 of 490). Plaintiff testified that he was consistent in his use of the CPAP, despite evidence to the contrary (Docket No. 10, pp. 35-36 of 490). Plaintiff further testified that the machine made no difference: his symptoms remained unchanged (Docket No. 10, pp. 35-36 of 490). Despite the orders of his doctors, Plaintiff testified that he engaged in only minimal amounts of exercise, given his poor knees and feet (Docket No. 10, pp. 36-37 of 490). Plaintiff denied playing basketball and dancing at a

---

[1] It should be noted the transcript of Plaintiff's hearing is incomplete: according to the file, the transcriber was unable to hear the audio file for approximately the first 25 minutes of Plaintiff's testimony (Docket No. 10, p. 32 of 490).

3

"normal" level, despite evidence in the record to the contrary (Docket No. 10, pp. 36-37 of 490).
Plaintiff reported driving a few times per week, although never long distances (Docket No. 10,
pp. 39, 42 of 490). He also testified to taking "quick dozes" when stopped at red lights (Docket
No. 10, p. 39 of 490). Plaintiff stated he had gone on vacation within the past year (Docket No.
10, p. 44 of 490).

      With regard to the pain in his knees and feet, Plaintiff testified he was only capable of
walking one block without having to stop, sit for a period of about sixty minutes without having
to stand, and lift only a maximum of twenty pounds (Docket No. 10, pp. 45-46 of 490). Plaintiff
stated he could stand for approximately twenty minutes without his knees going weak or his
plantar fasciitis flaring (Docket No. 10, pp. 51-52 of 490). He also reported having difficulties
bending forward at the waist and difficulties with his balance; although when pressed, Plaintiff
could not specifically state what those problems entail (Docket No. 10, p. 46 of 490). Plaintiff
described his pain as "consistent," with the most severe pain occurring upon waking and then
lasting throughout the day, and worsening with any type of moisture in the air (Docket No. 10, p.
47 of 490). Plaintiff stated the pain had gotten worse over the years (Docket No. 10, p. 48 of
490).

      When asked about household activities, Plaintiff stated he was capable of mowing his
yard, although he usually hired others to do it (Docket No. 10, pp. 41-42 of 490), and that he
received assistance in doing basic household chores (Docket No. 10, pp. 48-49 of 490). Plaintiff
attributed his difficulty with doing chores such as laundry, shoveling snow, doing the dishes,
vacuuming, and sweeping to the stairs in his home as well as his inability to stand for long
periods of time (Docket No. 10, pp. 48-49 of 490).

Plaintiff testified that his most recent employment occurred in October 2009 for a period of several weeks when he worked for the Census Bureau (Docket No. 10, p. 50 of 490). He stated he was looking for work but admitted to not being able to keep a job for any significant length of time (Docket No. 10, p. 50 of 490). According to Plaintiff, he has tried, although unsuccessfully, more than forty times since 1993 to obtain and keep employment (Docket No. 10, p. 51 of 490). Plaintiff stated his primary obstacle with maintaining employment is his tendency to fall asleep while on the job (Docket No. 10, p. 51 of 490). His sleep apnea is unpredictable, "it happens in settings like classrooms, meetings, anything long periods of time where [Plaintiff is] not participating, where [he is] not talking, where [he is] not moving [his] hands or arms, where [he] just happens to be a spectator or listener" (Docket No. 10, p. 55 of 490). Plaintiff testified that he does not suffer from his "sudden naps" when he is engaged in an activity or talking (Docket No. 10, p. 57 of 490). Plaintiff also stated he is able to watch a movie or one-hour television program without falling asleep if it holds his attention (Docket No. 10, pp. 55, 58-59 of 490).

When asked by ALJ Emerson if he had ever considered taking a more active job where he was constantly moving and engaged, Plaintiff answered in the negative, stating "there's just no way around it as far as I'm concerned . . . I'm gonna fall asleep. I mean, it's just what happens" (Docket No. 10, p. 60 of 490).

## 2.  TESTIMONY OF VOCATIONAL EXPERT

Mr. Anderson testified that he based his findings on a review of the record and Plaintiff's testimony (Docket No. 10, p. 64 of 490). More specifically, Mr. Anderson testified that it was his understanding that Plaintiff had been primarily engaged in sales, a skilled occupation requiring a

light level of exertion (Docket No. 10, pp. 64-65 of 490). ALJ Emerson then posed the following

hypothetical question to Mr. Anderson:

> Assume a person of the claimant's age, education and work experience who is able
> to perform medium work as that term is defined in the Social Security
> Administration's regulations, but further, that individual can only occasionally climb
> ramps or stairs, balance, stoop, kneel, crouch and crawl. That individual can never
> climb ladders, ropes or scaffolds. Further that individual would need to avoid
> concentrated exposure to extreme cold . . . to extreme heat . . . to humidity . . . to
> pulmonary irritants such as fumes, odors, dust, gases and poorly ventilated areas.
> Further, that individual would need to avoid concentrated exposure to hazardous
> moving, machinery and unprotected heights. Could an individual with these
> limitations perform the claimant's past work as it was actually performed or as it is
> customarily performed in the national economy?

(Docket No. 10, p. 65 of 490). Based on the constraints of the hypothetical, Mr. Anderson

testified that such an individual could satisfactorily perform all past work (Docket No. 10, p. 65

of 490). Furthermore, Mr. Anderson stated there are a number of other jobs such individual

could hold, including general laborer, assembler of metal furniture, and assembler of printed

circuit boards, for which there are multiple thousands of opportunities (Docket No. 10, pp. 65-66

of 490).

ALJ Emerson then posed a second hypothetical to Mr. Anderson, asking him to assume

"a person of the claimant's age, education and work experience was able to perform *light*

 work . . . but that individual would still have the same postural limitations as in the first

hypothetical as well as the same environmental limitations" (Docket No. 10, p. 66 of 490)

(emphasis added). Mr. Anderson again stated an individual could also satisfactorily perform

Plaintiff's past work within the limitations (Docket No. 10, p. 66 of 490). Mr. Anderson testified

there were other jobs an individual could perform at the light level within the specified

constraints, including assembler of small products, mail clerk, and storage facility rental clerk

(Docket No. 10, p. 67 of 490). Mr. Anderson stated there are multiple thousands of opportunities for this type of work as well (Docket No. 10, p. 67 of 490).

Finally, ALJ Emerson posed a third hypothetical to Mr. Anderson, asking him to assume the same postural and environmental limitations as previously established, but this time at a sedentary level (Docket No. 10, p. 67 of 490). Mr. Anderson stated Plaintiff could perform his past work as a sales manager at this sedentary level, but likely not his outside sales positions (Docket No. 10, pp. 67-68 of 490). There were also additional jobs in the economy Plaintiff could perform within the given parameters, including appointment clerk, document preparer, and charge account authorizer (Docket No. 10, p. 69 of 490).

Plaintiff's representative then asked Mr. Anderson how a need to take frequent breaks away from the workforce, approximately ten minutes out of every hour, would affect an individual's ability to work within the given parameters (Docket No. 10, p. 69 of 490). Mr. Anderson testified such an individual would be "right on the borderline of being employable. If he exceeds more than ten minutes, then he's not going to be employable" (Docket No. 10, pp. 69-70 of 490). Mr. Anderson also stated a need for frequent sitting and standing would likely not impact Plaintiff's ability to engage in his past employment or a variety of other positions, as long as there was no interruption in productivity (Docket No. 10, p. 70 of 490).

## B. MEDICAL RECORDS

### 1. PLAINTIFF'S OBSTRUCTIVE SLEEP APNEA ("OSA")

Prior to Plaintiff's alleged onset date of December 10, 2004, Plaintiff experienced significant pain and discomfort as a result of his medical impairments. On January 16, 2003, at the request of his treating physician, Dr. Salomone, Plaintiff underwent a sleep/wake evaluation,

including one night of clinical polysomnography, in an effort to determine the cause of Plaintiff's loud snoring and daytime sleepiness (Docket No. 10, p. 327 of 490). As early as his January 2003 appointment, Dr. Salomone recommended Plaintiff begin the use of a nasal CPAP (Docket No. 10, p. 327 of 490). On November 10, 2004, Plaintiff's alleged date of onset, Plaintiff underwent a repeat polysomnography study with CPAP titration, which revealed his OSA was successfully controlled with nasal CPAP at 8 cm water pressure (Docket No. 10, p. 324 of 490).

Subsequent to Plaintiff's alleged onset date, he continued to experience some level of symptoms (Docket No. 10, p. 323 of 490). Plaintiff returned to Dr. Salomone on June 20, 2007, complaining of continued severe daytime sleepiness (Docket No. 10, p. 323 of 490). Dr. Salomone's notes from this June 20th visit state Plaintiff "was adequately controlled on a nasal CPAP at 8cm water pressure . . . The patient, unfortunately, admits that he only wears his CPAP machine 2 to 3 nights a week for 4 or 5 hours a night" (Docket No. 10, p. 323 of 490). On July 17, 2007, Plaintiff underwent a repeat polysomnography study that revealed extremely severe OSA with an apnea-hypopnea index of 133 events per hour of sleep, associated with severe arterial denaturation as low as 79% (Docket No. 10, p. 317 of 490). Plaintiff's OSA was controlled during this study with nasal CPAP at 11 cm water pressure (Docket No. 10, p. 317 of 490). Plaintiff was therefore prescribed nasal CPAP at 11 cm water pressure (Docket No. 10, p. 317 of 490).

In an August 8, 2007, letter to the Social Security Administration, Dr. Salomone indicated Plaintiff was "a morbidly obese male who weighs over 300 pounds" who suffers from "extremely severe [OSA]. The patient . . . has great difficultly getting used to CPAP" (Docket

No. 10, p. 318 of 490). In his letter, Dr. Salomone indicated Plaintiff was to increase his CPAP to 12 cm water pressure and add heated humidity (Docket No. 10, p. 318 of 490). Dr. Salomone also advised Plaintiff "go on a stringent weight-loss program or even consider bariatric surgery" (Docket No. 10, p. 318 of 490). At that time, Dr. Salomone indicated it was his belief Plaintiff was unable to work given his persistent daytime sleepiness (Docket No. 10, p. 318 of 490). Dr. Salomone reiterated his August 2007 diagnosis in a second letter to the Social Security Administration, dated September 17, 2007 (Docket No. 10, p. 312 of 490). On October 30, 2007, state agency medical expert Dr. Linda Hall, M.D. ("Dr. Hall"), reviewed Plaintiff's file and found no severe impairment, noting nasal CPAP at 11 cm water pressure controlled all but a rare respiratory event for Plaintiff (Docket No. 10, p. 355 of 490). Dr. Hall also suggested Plaintiff engage in a weight-loss program or consider bariatric surgery (Docket No. 10, p. 355 of 490).

In July 2009, Plaintiff underwent a titration sleep study at the Cleveland Clinic Foundation (Docket No. 10, pp. 355-58 of 490). This study revealed Plaintiff's continued OSA, this time with elimination of symptoms at 19 cm water pressure with humidification (Docket No. 10, pp. 355-58 of 490). One month later, in August 2009, Dr. Salomone again issued a letter to the Social Security Administration on behalf of Plaintiff in which he diagnosed Plaintiff with severe OSA and stated Plaintiff "has had a minimal response to very aggressive CPAP therapy," despite now wearing his CPAP faithfully (Docket No. 10, p. 394 of 490). Dr. Salomone also noted Plaintiff had gained weight (Docket No. 10, p. 394 of 490). Again Dr. Salomone opined Plaintiff was unable to hold gainful employment (Docket No. 10, p. 394 of 490).

On September 24, 2009, Plaintiff sought the opinion of Dr. Ibrahim (Docket No. 10, p. 398 of 490). Plaintiff reported using his CPAP with full face mask at 19 cm water pressure four

9

to six hours nightly with no improvement (Docket No. 10, p. 479 of 490). Dr. Ibrahim diagnosed

Plaintiff with severe OSA and likely obesity-related hypoxemia (Docket No. 10, pp. 482-83 of

490). In her letter to the Social Security Administration, Dr. Ibrahim stated

> [Plaintiff] has Obstructive Sleep Apnea, and despite treatment, continues to have
> some residual sleepiness. Although a recent study shows a change in therapy is
> needed, we will need to continue evaluation of his sleepiness. During this time, it
> may be reasonable to support him in any way you can so he can gain the ability to
> maintain a standard of living while we evaluate and treat him. I believe we may have
> success in treating him in the future.

(Docket No. 10, p. 398 of 490).

On October 6, 2009, state agency medical expert Rebecca Neiger, M.D. ("Dr. Neiger"),

reviewed Plaintiff's file and performed a Physical Residual Functional Capacity Assessment

("RFC") (Docket No. 10, pp. 399-406 of 490). Dr. Neiger opined Plaintiff could perform

medium exertional work with occasional postural activities (Docket No. 10, pp. 399-406 of 490).

Dr. Neiger advised Plaintiff against activities such as climbing ladders, ropes or scaffolds, and

work involving hazards such as machinery or heights (Docket No. 10, pp. 399-406 of 490).

On November 3, 2009, Plaintiff underwent another sleep study ordered by Dr. Ibrahim,

which revealed that a CPAP setting of 20 cm water pressure normalized Plaintiff's apnea-

hypoapnea, eliminated his snoring, and maintained his oxygen saturation above 94% (Docket

No. 10, p. 489 of 490). A multiple sleep latency test conducted on the same date revealed

Plaintiff had moderate hypersomnolence, but did not meet the clinical criteria for narcolepsy

(Docket No. 10, p. 486 of 490).

On November 25, 2009, Plaintiff was seen by both Dr. Ibrahaim and Ms. Kabat (Docket

No. 10, pp. 443-54 of 490). Plaintiff reported non-compliance with his CPAP, using it only two

to three days per week, because he typically fell asleep and forgot to put the mask on (Docket

10

No. 10, p. 447 of 490). Ms. Kabat reinforced Plaintiff's need for CPAP therapy and noted there was no electrodiagnostic evidence of narcolepsy (Docket No. 10, p. 447 of 490). Dr. Ibrahim opined Plaintiff's hypersomnia was likely a reflection of Plaintiff's untreated OSA (Docket No. 10, p. 447 of 490). Plaintiff reported the mask was "somewhat socially cumbersome," but Dr. Ibrahim advised Plaintiff that falling asleep prior to mask placement was a problem (Docket No. 10, p. 447 of 490). Dr. Ibrahim concluded "we have supported a temporary disability due to significant hypersomnia that has impacted [Plaintiff's] ability to function at work. During this time, we aim to have optimal compliance with CPAP" (Docket No. 10, p. 447 of 490).

In February 2010, Ms. Kabat reported Plaintiff remained non-compliant with CPAP therapy, wearing his mask only one night per week for four hours and falling asleep prior to mask placement (Docket No. 10, pp. 407, 409 of 490). Plaintiff indicated during his visit he had been fired from 39 of his past 41 jobs due to excessive daytime sleepiness (Docket No. 10, p. 407 of 490). Plaintiff verbalized his understanding that no progress would occur unless he wore the CPAP mask for at least four hours every night (Docket No. 10, p. 409 of 490). Two months later, in April 2010, Ms. Kabat reported Plaintiff had minimal improvement on the CPAP set at 20 cm water pressure (Docket No. 10, p. 435 of 490).  Plaintiff, who had been using the CPAP five nights per week for six hours at a time, denied pressure intolerance or interface issues and reported feeling slightly improved and less sleepy since becoming compliant with CPAP therapy (Docket No. 10, p. 435 of 490). Ms. Kabat recommended continued CPAP use at 20 cm water pressure (Docket No. 10, p. 435 of 490).

On May 11, 2010, Ms. Kabat completed a medical source statement concerning Plaintiff's physical capacity (Docket No. 10, pp. 455-56 of 490). Ms. Kabat opined Plaintiff had

11

the ability to: (1) lift twenty pounds occasionally; (2) lift zero pounds frequently; (3) stand/walk thirty minutes to an hour without interruption in an eight-hour day; (4) sit one hour at most in an eight hour day without interruption; and (5) occasionally climb, balance, stoop, crouch, reach, handle, feel, push/pull, and perform fine and gross manipulation (Docket No. 10, pp. 455-56 of 490). Ms. Kabat advised that Plaintiff should rarely to never kneel or crawl and should avoid heights, moving machinery, and temperature extremes (Docket No. 10, pp. 455-56 of 490). When asked if there were any additional limitations that would interfere with Plaintiff's ability to work eight hours per day, five days per week, Ms. Kabat stated Plaintiff was "very sleepy . . . [and] experienc[es] excessive daytime sleepiness despite treatment/compliance with CPAP machine" (Docket No. 10, p. 456 of 490).

### 2. PLAINTIFF'S DEGENERATIVE JOINT DISEASE AND HYPERTENSION

In addition to his OSA, Plaintiff has also complained of right patella pain and bilateral foot pain (Docket No. 10, pp. 365, 421 of 490). On July 9, 2009, Plaintiff was seen by Dr. Jason Brown, D.O. ("Dr. Brown") at Huron Hospital due to pain in the right knee of four to five months duration (Docket No. 10, p. 381 of 490). On exam, Plaintiff was found to have patellofemoral crepitus with flexion and extension and tenderness of the medial joint line (Docket No. 10, p. 381 of 490). X-ray testing revealed mild medial joint space narrowing bilaterally (Docket No. 10, p. 387 of 490). Plaintiff thereafter attended physical therapy, but was non-compliant in doing his ordered home exercises (Docket No. 10, p. 372 of 490). Plaintiff's physical therapist, Jennifer Brantingham ("Ms. Brantingham"), reported Plaintiff could complete all exercises without pain and that Plaintiff's "pain rating DOES NOT match his functional status" (Docket No. 10, p. 372 of 490) (emphasis in original). In August 2009, Ms. Brantingham

reported Plaintiff had no increased pain upon exercise and noted his "pain rating continues NOT TO match his functional ability" (Docket No. 10, p. 369 of 490) (emphasis in original). Plaintiff reported having played basketball on August 12, 2009 (Docket No. 10, p. 365 of 490). Plaintiff was discharged from physical therapy on August 13, 2009, with instructions to continue his home exercises (Docket No. 10, p. 365 of 490).

Plaintiff returned to Huron Hospital on February 9, 2010, complaining of plantar pain (Docket No. 10, p. 428 of 490). Plaintiff's physical examination revealed normal findings, including full muscle strength throughout (Docket No. 10, pp. 421, 428 of 490). The attending physician recommended Plaintiff engage in morning stretching and take Advil as needed (Docket No. 10, p. 429 of 490). On March 16, 2010, Plaintiff complained of swelling in his left knee, right knee pain, and pain in the sole of his left foot (Docket No. 10, p. 424 of 490). Plaintiff was diagnosed with hypertension, ankle pain, right knee pain, and morbid obesity (Docket No. 10, p. 418 of 490).

On May 18, 2010, Plaintiff consulted podiatrist Dr. Nathaniel Applegate, D.P.M. ("Dr. Applegate"), complaining of pain in the bottom of both feet which worsened with weight bearing (Docket No. 10, p. 460 of 490). X-rays taken of Plaintiff's feet were negative (Docket No. 10, p. 477 of 490). Plaintiff was diagnosed with bilateral plantar faciitis and was advised to wear athletic-type shoes with supportive insoles (Docket No. 10, p. 461 of 490). On July 19, 2010, Plaintiff returned to Dr. Applegate complaining of worsening foot pain (Docket No. 10, p. 470 of 490). On exam, Plaintiff was found to have pain on palpation in the plantar medial tubercle of the calcaneus of his left foot (Docket No. 10, p. 470 of 490). Dr. Applegate also noted Plaintiff was "not wearing good supportive shoes, wears inserts occasionally, [and] stretches initially for

13

a while" (Docket No. 10, p. 470 of 490). Plaintiff came into the office wearing clogs and admitted to wearing clogs and slippers most of the time, something Plaintiff had been specifically advised not to do (Docket No. 10, p. 470 of 490). Plaintiff was again diagnosed with plantar fasciitis and given nighttime ankle braces (Docket No. 10, p. 472 of 490).

## IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920. *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42 U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim.  First, a claimant must demonstrate he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id*. (*citing Abbott,* 905 F. 2d at 923).  Third, if a claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets

14

a "listed" impairment, the claimant is presumed to be disabled regardless of age, education or work experience. *Colvin*, 475 F.3d at 730. Fourth, if the claimant's impairment does not prevent him from doing past relevant work, the claimant is not disabled. *Id.* Finally, even if the claimant's impairment does prevent him from doing past relevant work, if other work exists in the national economy that he can perform, the claimant is not disabled. *Id.* (*citin*g *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Emerson made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2011.

2.  Plaintiff has not engaged in substantial gainful activity since December 10, 2004, the alleged onset date.

3.  Plaintiff has the following severe impairments: sleep apnea, obesity, degenerative joint disease of the bilateral knee, plantar fasciitis, and hypertension.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.

5.  Plaintiff has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), in that he can lift up to 20 pounds occasionally and 10 pounds frequently and can sit, stand, and walk for up to six hours in an eight-hour workday. He can only do occasional crawling, kneeling, balancing, stooping and crouching, and occasional climbing of ramps or stairs. He should never climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to temperature extremes, humidity, and pulmonary irritants; and should

15

avoid dangerous machinery and unprotected heights.

6.    Plaintiff is capable of performing past relevant work as a sales representative and sales manager. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity.

7.    Plaintiff has not been under a disability, as defined in the Social Security Act, from December 10, 2004, through the date of this decision.

(Docket No. 10, pp. 16-23 of 490).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health & Human Servs*., 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

16

## IX.  ANALYSIS

### A. PLAINTIFF'S ALLEGATIONS

Plaintiff contends: (1) the ALJ failed to give proper weight to the opinion of his treating physician Dr. Salomone and failed to adequately explain his rejection thereof; and (2) the ALJ erred in his determination that Plaintiff could perform light work (Docket No. 15).

### B. DEFENDANT'S RESPONSE

Defendant contends: (1) the ALJ properly evaluated Plaintiff's testimony and record statements and found sufficient substantial evidence to reject the opinions of Plaintiff's treating physician; and (2) such substantial evidence supports the ALJ's finding that Plaintiff is capable of engaging in a reduced range of light work (Docket No. 16).

### C. DISCUSSION

#### 1.    THE TREATING PHYSICIAN RULE

This Court provided a detailed summary of the treating physician rule in *Mowery v. Comm'r of Soc. Sec.* (2011 U.S. Dist. LEXIS 27291 (N.D. Ohio 2011)):

> The regulations of the Social Security Administration require the Commissioner to give more weight to opinions of treating sources than to those of non-treating sources under appropriate circumstances. *Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 729-30 (N.D. Ohio 2005). Generally, more weight is attributed to treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). If such opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. *Id.*

*Mowery*, 2011 U.S. Dist. LEXIS at * 21.

17

In light of this standard, and despite the overwhelming medical evidence in support of the ALJ's opinion, this Magistrate must find the ALJ failed to properly abide by the treating physician rule. In a thorough review of Plaintiff's medical records, it is apparent the medical evidence acquired by Plaintiff's physicians, Drs. Salomone and Ibrahim, as well as that acquired by Dr. Ibrahim's physician's assistant Ms. Kabat, supports a finding that Plaintiff's sleep apnea is well-controlled through Plaintiff's consistent use of his CPAP machine. As such, the ALJ correctly determined Dr. Salomone's opinion did not square with the objective medical evidence in Plaintiff's record (Docket No. 10, p. 22 of 490). However, ALJ Emerson failed to fulfill the requirements of the treating physician rule once he made this finding. In *Mowery*, this Magistrate confirmed the process, stated in *Wilson v. Comm'r of Soc. Sec.* (378 F.3d 541, 544 (6th Cir. 2004), an ALJ must go through once deciding not to give a claimant's treating physician controlling weight:

> The Sixth Circuit notes that the treating source rule in the regulations emphasizes a "good reason requirement," specifically, the agency must "give good reasons" for not affording controlling weight to a treating physician's opinion in the context of a disability determination. *Id.* (*citing Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). To meet this obligation . . . the ALJ must do the following:
>
> • State that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record
> • Identify evidence supporting such finding
> • Explain the application of the factors listed in 20 C.F.R § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Id.* (*citing Wilson, supra*, at 546).

ALJ Emerson stated Dr. Salomone's opinion "is not consistent with the medical findings or the claimant's sleep studies," thus satisfying the first *Wilson* requirement (Docket No. 10, p. 22 of 490). However, aside from a citation to Plaintiff's medical record, the opinion is devoid of identification of any evidence supporting this finding. The ALJ states the symptoms of Plaintiff's

18

sleep apnea "have been largely alleviated so as to render him able to function in accord with his residual function capacity . . . [s]pecifically . . . he was prescribed and obtained a CPAP . . . machine to combat his sleep apnea" (Docket No. 10, pp. 21-22 of 490). The ALJ also cites Plaintiff's failure to consistently use his CPAP machine and Plaintiff's improvement when he does use the device as directed (Docket No. 10, p. 22 of 490). However, this is the only reference even bordering on sufficient evidence supporting the ALJ's decision to afford Dr. Salomone's opinion less than controlling weight.

Furthermore, ALJ Emerson, given his dismissal of Dr. Salomone's opinion, should have applied and explained his application of the factors listed in 20 C.F.R. § 404.1527(c)(2). He failed to do so. Factors to be examined include: (1) examining relationship; (2) treatment relationship, including the length of treatment and the frequency of examination; (3) supportability; (4) consistency; (5) specialization; and (6) any other factors brought to the Commissioner's attention. 20 C.F.R. § 404.1527(c)(2). Nowhere in his written opinion does ALJ Emerson provide an analysis of these factors (Docket No. 10, pp. 16-23 of 490).

It is a fundamental principle of administrative law that an agency is bound to follow its own regulations. *Wilson*, 378 F.3d at 545. "An agency's failure to follow its own regulations tends to cause unjust discrimination and deny adequate notice and consequently may result in a violation of an individual's constitutional right to due process." *Id*. (*citing Sameena, Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (internal citations omitted)). Courts have remanded the decision of the Commissioner when it has failed to articulate "good reasons" for not crediting the opinion of a claimant's treating physician. *Wilson*, 378 F.3d at 545.

Based on the ALJ's failure to abide by the requirements of the treating physician rule,

this Magistrate must remand this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

### 2.      Light Work

In his second claim, Plaintiff alleges the ALJ erred when he determined Plaintiff was capable of performing a reduced range of "light" work (Docket No. 15, p. 16 of 20). To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 404.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can

20

still do that have been provided by medical sources, whether or not they are based on formal

medical examinations. [The Commissioner] will also consider descriptions and observations of

[a claimant's] limitations from [his] impairment(s), including limitations that result from [his]

symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other

persons." 20 C.F.R. § 404.1545(a)(3). Responsibility for deciding residual functional capacity

rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

     In the present case, ALJ Emerson found, upon consideration of the entire record, that

Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§

404.1567(b) and 416.967(b) (Docket No. 10, p. 20 of 490). The ALJ found Plaintiff

> can lift up to 20 pounds occasionally and 10 pounds frequently and can sit, stand, and
> walk for up to six hours in an eight-hour workday. He can only do occasional
> crawling, kneeling, balancing, stooping and crouching, and occasional climbing of
> ramps or stairs. He should never climb ladders, ropes, or scaffolds; and should avoid
> concentrated exposure to temperature extremes, humidity, and pulmonary irritants;
> and should avoid dangerous machinery and unprotected heights.

(Docket No. 10, p. 20 of 490).

The ALJ based his residual functional capacity determination upon the following:

> The claimant alleges disability due to sleep apnea, degenerative joint disease of the
> knees, and limitations from plantar fasciitis. The claimant contends that because of
> his sleep apnea disorder, he is unable to stay awake at work during required meetings
> and at sedentary times. He testified that he cannot do anything for long periods of
> time, that he cannot carry more than 20 pounds at a time, that he cannot sit for longer
> than 60 minutes, and that he can only walk one block before needing a rest.
>
> In terms of the claimant's limitations related to degenerative joint disease of the
> knees, the medical evidence does not establish disabling limitations. Following
> reports of knee pain, in 2009, X-rays were taken of the claimant's knees; the X-rays
> found evidence of early degenerative joint disease, only. The claimant was,
> thereafter, referred to physical therapy, for which he modestly complied, for the full
> two months. Physical therapy notes indicate progress, including that his knees were
> feeling better and that there was no evidence of any deficits in the claimant's
> ambulation. Additionally, the claimant was doing well enough to play basketball by

21

the end of his physical therapy in August of 2009, and reported no pain, according to therapy records. The next documented report of knee pain or problems was in March of 2010, wherein the claimant sought treatment for a sore knee relative to a strenuous night of dancing. I find that the claimant's alleged limitations, concerning degenerative joint disease of the knees, are not supported, or established, by the medical evidence.

The claimant's plantar fasciitis is adequately controlled, so as not to pose any additional limitations beyond what is reflected in the claimant's stated residual functional capacity assessment. The claimant was diagnosed with plantar fasciitis in 2010; later X-ray tests confirmed said diagnosis. The claimant's treating physician suggested that with stretching exercises, shoe inserts, and proper footwear, the plantar fasciitis should be adequately controlled.

Concerning hypertension, although the claimant reportedly does not always take his blood pressure medication as prescribed, his hypertension is benign and does not render him disabled. I have considered hypertension with the other stated impairments, and I have included it in determining the claimant's residual functional capacity . . .

Now turning to the claimant's obstructive sleep apnea impairment and limitations, I find that the medical findings, objective and otherwise, do not corroborate the disabling limitations alleged by the claimant. The claimant has a history of sleep apnea, however, following repeat testing and medical efforts, the claimant's condition, or at least the symptoms, have been largely alleviated so as to render him able to function in accord with his residual functional capacity. Specifically, the claimant has a history of sleep apnea; he was prescribed and obtained a CPAP . . . machine to combat his sleep apnea. The claimant also has a history of not using the CPAP machine as prescribed, even though he reports no significant discomfort or difficulty from its use. The medical evidence specifically reflects that the claimant's sleep apnea and, therefore, his ability to sleep, dramatically improves with regular use of the CPAP machine. I find that when the claimant follows his primary care physician's advice, and uses his CPAP machine, that he is not disabled and that he can function to the level of his stated residual functional capacity.

(Docket No. 10, pp. 21-22 of 490).

ALJ Emerson stated his residual functional capacity determination was supported by

Plaintiff's medical records, which show Plaintiff suffers from severe OSA, the beginnings of

degenerative joint disease of the knees, and limitations from plantar fasciitis, and that the

aforesaid conditions and reasonable limitations associated therewith are adequately addressed in

the residual functional capacity finding (Docket No. 10, p. 21 of 490).

Further, ALJ Emerson relied upon the testimony of the VE, Mr. Anderson, who testified Plaintiff, even under the ALJ's specified limitations, could return to his past employment in sales at both a medium and light work level, as those terms are defined in the Social Security Administration's regulations, as well as engage in "other work" at those levels of exertion (Docket No. 10, pp. 65-67 of 490). "The testimony of a vocational expert identifying specific jobs available in the regional economy that an individual with the claimant's limitation could perform can constitute substantial evidence supporting an ALJ's finding . . . that the claimant can perform other work." *Wilson*, 378 F.3d at 549. An ALJ may obtain such testimony through the use of hypothetical questions. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). However, "if the hypothetical question does not accurately portray Plaintiff's physical and mental state, the vocational expert's testimony in response to the hypothetical question may not serve as substantial evidence in support of the ALJ's finding that Plaintiff could perform other work." *Lancaster v. Comm'r of Soc. Sec.*, 228 Fed. Appx. 563, 573 (6th Cir. 2007).

As previously stated, ALJ Emerson posed three hypothetical questions to the VE during the December 6, 2010, administrative hearing. ALJ Emerson asked the VE to determine whether an individual with specified limitations could perform Plaintiff's past work or other work at either medium (hypothetical number one), light (hypothetical number two), or sedentary (hypothetical number three) levels of exertion (Docket No. 10, pp. 65-68 of 490). The ALJ stated the limitation parameters as follows:

> The individual can only occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl. That individual can never climb ladders, ropes or scaffolds.

23

Further that individual would need to avoid concentrated exposure to extreme cold
. . . extreme heat . . . humidity . . . pulmonary irritants such as fumes, odors, dust,
gases and poorly ventilated areas. Further, that individual would need to avoid
concentrated exposure to hazardous moving, machinery and unprotected heights.

(Docket No. 10, p. 65 of 490). The VE answered in the affirmative to hypothetical questions one

and two, stating an individual could perform both Plaintiff's past work and other work within

those limitations at the specified level of exertion (Docket No. 10, pp. 65-67 of 490). The VE

also answered in the affirmative to hypothetical question three, but stated such an individual

could likely only perform Plaintiff's prior sales manager positions, not his outside sales positions

(Docket No. 10, pp. 67-68 of 490).

Plaintiff alleges he is not capable of performing substantial gainful activity at any

exertional level (Docket No. 15, p. 17 of 20). To support this claim, Plaintiff points to the

opinions of his treating physicians, Drs. Salomone and Ibrahim, the assessment of his residual

functional capacity performed by Ms. Kabat, and his own testimony (Docket No. 15, p. 17 of

20). The Defendant disagrees, stating Plaintiff failed to prove he has greater functional

limitations than those set forth in the ALJ's hypothetical questions (Docket No. 16, p. 17 of 20).

Under the regulations, an ALJ

*will* consider residual functional capacity assessments made by State agency medical
and psychological consultants, medical and psychological experts . . . , and other
program physicians and psychologists to be 'statements about what [a claimant] can
still do' made by non-examining physicians and psychologists based on their review
of the evidence in the case record

20 C.F.R. § 404.1513(c) (emphasis added). In addition to these State agency medical experts, the

ALJ *may* consider evidence from other sources, such as a nurse practitioner or physician's

assistant, to show the severity of a claimant's impairments and how that severity affects the

claimant's ability to work. 20 C.F.R. § 20.1513(d)(1).

24

In the case at hand, State agency medical expert Dr. Neiger reviewed Plaintiff's file in October 2009 and opined Plaintiff could: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk with normal breaks approximately six hours in an eight-hour workday; (4) sit with normal breaks for a total of six hours in an eight-hour day; and (5) engage in unlimited pushing and/or pulling (Docket No. 10, p. 400 of 490). Dr. Neiger also opined Plaintiff should only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, and should never climb ladders, ropes or scaffolds (Docket No. 10, p. 401 of 490). Dr. Neiger found no environmental limitations, but noted Plaintiff should avoid unprotected heights, and operating machinery or a motor vehicle (Docket No. 10, p. 403 of 490).

Little more than six months later, on May 11, 2010, Ms. Kabat performed a Physical Capacity Evaluation of Plaintiff (Docket No. 10, pp. 455-56 of 490). Her report indicated Plaintiff: (1) may occasionally lift/carry less than 20 pounds and frequently lift/carry zero pounds; (2) can stand and/or walk up to one hour without interruption; (3) can sit up to one hour at most without interruption; (4) can occasionally climb, balance, stoop, crouch, reach, handle, feel, push/pull, and engage in fine or gross manipulation; (5) can rarely, if ever, kneel or crawl; (6) should avoid heights, moving machinery, and temperature extremes; and (7) requires an at-will sit/stand option (Docket No. 10, pp. 455-56 of 490).

A review of the entire record reveals ALJ Emerson's hypothetical questions mirrored the results of Plaintiff's RFC evaluation and properly contained all of Plaintiff's functional limitations as established by the objective medical evidence. "It is well established than an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*,

25

987 F.2d 1230, 1235 (6th Cir. 1993). Based on his recommendation, it is clear ALJ Emerson relied on Dr. Neiger's RFC evaluation of Plaintiff, as required by the regulations. It should be noted that, despite Plaintiff's insistence to the contrary, ALJ Emerson was not required to adopt the opinion of Ms. Kabat, a nurse practitioner. This Magistrate finds ALJ Emerson complied with the controlling agency rulings and regulations in determining Plaintiff could perform his past relevant work despite his limitations. Plaintiff has failed to prove he has greater functional limitations than those provided in ALJ Emerson's hypothetical questions. Therefore, the ALJ was entitled to rely on the VE's responsive testimony as substantial evidence supporting his finding that Plaintiff can perform the actual demands of his past work.

This Magistrate therefore affirms the Commissioner's decision with regard to Plaintiff's second assignment of error.

## X. CONCLUSION

For the foregoing reasons, this Magistrate remands this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) to properly articulate the weight to be attributed to Plaintiff's treating physician or, alternately, give good reasons for discounting his opinion and for further proceedings consistent with this opinion.

_____/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date:   September 12, 2012

26